Follow me, we'll have a seat, and then you can tell us who you are or are. Oh, I'm sorry, why don't you call the case? For the appellant? And Mr. Frost, you'll be arguing? Yes, I will. Okay. Good afternoon, Your Honor. Andy Cohan, on behalf of the Appellate, American Drug Stores, UVA Hospital, Brooklyn. Good afternoon, Your Honor. Flip Cohan, also on behalf of the Appellate, American Drug Stores, New Jersey Science Hospital. Okay, and you'll be arguing for the appellant? Yes. All right, as you both know, all know, you have 20 minutes aside, you don't need to use it all. Would the appellant like to reserve some of that 20 for rebuttal? I'd like to reserve 5 minutes, please. Okay. And just keep your voices up, the microphone will not amplify your voices. So, Mr. Frost, whenever you're ready, please approach and begin. Thank you, Your Honor. May it please the Court, I'd like to first apologize that I'm not in my best voice today, and I will try and speak out clearly and without coughing, but I apologize in advance. If you need water, feel free to go get it. We won't even charge you for the time. Thank you, Judge. OSPR wishes to evade responsibility in this case for its liability for ignorance and inaction. It received package inserts from the manufacturer of Reglan starting in February of 2009. Those package inserts say, do not give this drug, do not, to physicians, do not give this drug for more than 12 weeks except in rare cases. That package insert, which came in 500 pill bottles, was then recycled once it was received at the pharmacy at 88th and Reglan. Those warnings were not known to the three pharmacists whom OSCO employed in this case. Two of them said they didn't learn of the warnings until after the lawsuit was filed against OSCO in 2015. One of them said she thought she might have heard of it in 2012 or 13, but didn't tell anyone about it. But who would decide whether this is a rare case anyway? That's a physician's choice. However, the physician needs to be advised of the warning. That is the safest way in this case to protect the patient. It cannot be assumed that every doctor who is getting a continuing renewal of a drug knows the drug. That's why the package insert is there. The doctor should have known this. He's accepted his responsibility in this case. But the pharmacy clearly knew it. They are experts in dispensing drugs. They received the warning. They have a responsibility because they knew Mr. Banik was taking this drug more than 12 weeks. He was in the danger group. The package insert says the danger is dose-dependent and cumulative dose-dependent. So the more you take it, the more likely you are to get this very terrible, non-treatable disease. But isn't it still the physician's decision whether the amount of doses are going to cause a problem to this patient or that? Ultimately, it is. This doctor testified he did not know about this warning. He did not know about the time limitation. And that had he been told by the pharmacy there is this black box warning, he said, I would have terminated the prescription right away. And that is credible in this case, Your Honor, because in August 2014, right before my client was diagnosed with tardive dyskinesia, OSCO called him because he started another drug for my client called Vibrid. And it came up in the computer system at OSCO that there is an interaction between Reglan and Vibrid. What did the pharmacist do? He or she phoned Dr. Ross and said there is an interaction. And he said don't give the Vibrid, terminate the prescription. He told the patient you're not getting Vibrid because of the information he got from the pharmacy. Okay, but causation is not your problem. Your problem is duty. That's your problem, right? You have questions that you can't get to until you establish a duty, right? I do, Your Honor. Okay. So let's talk about the duty. What makes this case special? Because isn't that what the Supreme Court says it has to be, it's special? What's special about it? What's special about it is that there are two drugs or potentially three, depending on which witness you believe in this case, that have time duration black box warnings. A black box warning is rather rare, and a black box warning with a time duration exists for three drugs, one of which is Reglan. Okay, but that's now. There could be ten more drugs developed in the next couple of years. It's going to be the black box warning with a time duration. That's the new special rule? That's what's so critical in this case because the doctor's prescription became contraindicated once he exceeded 12 weeks. And it's a contraindication. Potentially contraindicated. Relatively contraindicated according to what the experts say is. Now, the Happel case actually defines contraindication in two different ways. In the holding part of the language, they set a New York decision that says contraindications mean you shouldn't ever give it. But when it states the issue of the case on page 181, it cites language that says it's inadvisable to give the medication, which is relative contraindication. And they cite Webster's Third International Dictionary. They cite it again throughout the case. So the court uses contraindication two different ways. But if it's relative, isn't that for the physician to determine? Certainly. We're not asking OSCO to tell the patient not to take the drug. We're saying, OSCO, call the doctor, just like you did with Iverick. Say, doctor, were you aware of this black box warning and that your prescription exceeds it? That's it. We're not saying OSCO needs to know whether or not it's a rare case. We don't want OSCO to make that choice. We want the doctor to make that choice. I think what the courts are concerned about is having the pharmacist practice medicine and question the doctor every time a prescription is given. Well, that's always been raised in the briefs in the defense of this case, and it's throughout the appellate decisions. What the doctors testified to in this case is they appreciate getting phone calls from the pharmacy. The pharmacist said the doctors never bark at them. They're not unhappy to get the call, and the doctors appreciate the information if they're given something that might or is contraindicated. Go ahead. The burden is not really calling the doctor. That, I agree with you, is relatively minor. The burden, it sounds to me, from what you've described and what the record suggests, is making this determination in some sort of systemic way. How does the pharmacy, I mean, the pharmacy would have to change their entire computer system and alert system to make themselves, to make somebody aware so that they could call the doctor. Nobody was aware who could have called the doctor, is what you're saying. The pharmacist said they weren't aware. The three of them weren't. Right. So how are they supposed to be made aware? Pharmacists are, it's a profession. They're not just, you know, pill counters and cashiers. It's a profession. They are supposed to be updated. They go through continuing education. They get updated on new warnings. They get updated on black box warnings. So they had a duty to keep themselves educated about, every pharmacist had a duty to keep themselves educated as to this warning. Is that your position? Exactly, and that's what Dr. Polk testified to. The pharmacist had a duty to know that this drug had a black box warning. It's throughout the literature. There was a tremendous number of lawsuits against the manufacturer in the early 2000s about this. Just so we know what we'd be setting a precedent for here, how do you define this duty? Okay, a duty to know and then a duty to give a written warning? No. I think a written warning is not what's called for in this case. What we have said and what Dr. Polk testified to is the most responsible way to convey the information is just what OSCO did with the Vibrate incident. Pick up the phone, call the doctor and say, did you know that this prescription has a black box, this drug has a black box warning? Your prescription would appear to be in violation of it. Okay, now let's say they got 30 prescriptions, they filled it 30 times here is what the trial court said. So they call him eight times and he says, no, I think we should still be doing this. This is a rare case. Are they done or should they keep calling? That becomes a standard of care question. And if the doctor says, as the doctor did in Digiovanni, which I think frankly the apparel court made exactly the right decision in Digiovanni where it said the pharmacist is off the hook. In that case, the pharmacist called the doctor to say the two drugs that you prescribed have a potential interaction. What do you want me to do? And the doctor said, I want you to give the drug. I will monitor the patient. The apparel court quite properly said the pharmacist is off the hook in that case because the doctor said he's aware. If there are eight phone calls hypothetically to Dr. Roth saying, do you know that there's this limitation in the warning? I think, of course, OSCO is going to be able to say quite rightly, we're off the hook under Digiovanni. We've given the information that's been called for. It sounds like you believe that even one phone call would have been enough. I believe 100% that that's true, Your Honor, based on what Dr. Roth's testimony was and how he responded with a vibrant incident. Well, the duty is to warn. And whether the warning was sufficient is going to be a fact question for the jury, I assume, once somebody were to find legally that there was a duty, then the question of whether it was sufficient would be a fact question. Yes. Is that right? And frankly, you know, the pharmacy called Dr. Roth 12 different times during the four years at issue here to get renewals for this drug. It's not much of a burden to add a sentence. Again, the burden is, and I think this is the big burden I'm going to ask them about it, what is the, I mean, does the pharmacy really have a duty, each pharmacist, to be educated to a certain level and to use that to warn? I mean, that's what you're saying, that they need to be educated and then they need to warn. To notify the physician. Right. You know, and there are, we've certainly pled, and I think it's a viable pleading, to warn the plaintiff, to warn the patient himself. But it's more reliable to warn the doctor because it's the doctor who can say, I don't want the prescription given. Well, this is a rare case. But in this case, there was never even a verbal warning to the patient. Not at all. But a written warning was given. A written notification, exactly. Which is just included in the package. It was stapled onto the package. It didn't have the black box itself, but it had the same words. If this is why I struggle, I realize that duty is a legal question, but in this case, for me, it's really a common sense question. I don't, I frankly struggle with how a pharmacist could think that they don't have a duty to warn patients about information that they have. But what makes this case different, and this is fact specific, that they were ignorant of it. Well, they were ignorant of the warnings, but they shouldn't have been. You know, this is a situation where, as a professional, you're not allowed to be ignorant of the danger. You're not. You have to know the danger. Are they required to have continuing education? I'm sorry? Are they required to have continuing education? Yes, Your Honor. It's continuous legal education. Dr. Polk testified about it. You call it legal education? The education they get about the new warnings. But it's not legal education, continuing education? No. Okay. No, it's pharmacy education, and, you know, pharmacy is a science. And it's an important science, and in this case, you know, where we come down to is they knew from the pharmacy records in the computer that Mr. Urbanek had been taking this drug for years. We have one incorrect page reference in our brief, and I wanted to point it out to the Court, because I think it's an important issue. One of their people said that you could, when we would get a new prescription for a patient, we would just look in the computer and see how long he'd been on it. And I asked that person, how long? You know, well, we'd go back a couple of years. But where I'm struggling, and I want you to try to answer this question, because I believe Justice Griffin and Justice McMillan asked the question already. I'm not sure if I've heard the answer. What makes this case different, that we should find there's a duty to warrant? Well, I think, frankly, Your Honor, this case is quite similar to Happel, where a duty to warrant was affirmed, that there is a contraindication in this case to taking this drug for more than 12 weeks. The pharmacy knew that the patient had been taking it more than 12 weeks, and they get a new prescription that will continue the drug for longer. Those are the special circumstances that, at the end of the Happel decision, when the Court says, why do we have a duty to warrant, the Court says there have to be special circumstances. They knew Heidi, the pharmacy there knew Heidi Happel was allergic to aspirin. The contraindication in our case is Stefan Urbanik had been taking this drug for years, more than the 12 weeks. And so this would be narrowly tailored to basically three drugs throughout the country, or throughout the state, I guess, where there is this black box warning. Is that correct? With the duration. And more importantly... Black box warning with a duration. Right, and the doctor's prescription violated the duration by 24 times. You know, it's 24 times too much. So, you know... Are there cases that say that the pharmacy doesn't have an obligation to say when the dosage is too high? Yes, absolutely. And that's because in those cases, and I think that Hernandez-Balade addressed it best, where they said a pharmacist and a layperson is not going to have the objective information to know whether a dose is too high for this person or that person. Whereas, objectively speaking here, the black box warning says what's too much, what's not too much. Except in rare cases. Exactly. And if the doctor doesn't know of that warning, he needs to at least know that you don't do it. But the same with the dosage, right? No. If the doctor doesn't know of the dosage, he should be told? The difference with the dosage cases as well, Your Honor, is the package inserts for those simply say recommended dosage might be 100 milligrams a day. That's not a warning. It's not a black box warning. It's not a prohibition. Those are recommended dosages that if you weigh 300 pounds or 100 pounds, make a huge difference. If your metabolism is X or Y, it makes a big difference. But when you talk about duration of treatment with Reglan, it doesn't make a difference. The black box warning says only in rare cases do you exceed 12 weeks, and that becomes the doctor call, which in this case Dr. Ross answered by saying, absolutely, I would have terminated it. You give this drug to treat gastroparesis, which is a gastric emptying problem. It was likely cured years earlier. Stefan didn't need it. The drug was continued for years and years unnecessarily, according to Dr. Drummond. When they finally diagnosed tardive dyskinesia, the drug was stopped. He's never had a gastric problem since. So Dr. Ross would say, of course I would stop it. Right away, figure out if he ever needed it again. Of course, our case against Dr. Ross, which is settled, is he should have stopped it years before. Question not before the court today. But when it comes to our case, the special circumstances that Happel talks about that give rise to the duty to warn are the fact that this drug is contraindicated relatively for someone taking it more than 12 weeks. But again, isn't that the doctor going to have to determine the severity of the condition, the effect of the drug on them as it goes on? And there is testimony one of the doctors was prescribing it for five years. That's Dr. Luke, yes. So I mean, isn't it still come back to... Well, if Dr. Luke was the doctor involved all the way up to the end of this case and Dr. Luke said a warning wouldn't have much of a difference on him, I've got an entirely different case or perhaps no case at all. But it wasn't Dr. Luke. Those last four years with Dr. Ross who said... He didn't have a statute of limitations problem either. A statute of limits took him out, yes. But with Dr. Ross who said, if they'd only called me, I would have stopped it. And that was his practice. He's a family practice physician and he said, I rely on the pharmacist for that type of information. And he did it with Vibrant. Same pharmacy made the phone call about Vibrant. We wanted them to make the phone call about Revlin four years earlier and they didn't do it. There's no... If I recall correctly, the information is also sent to the doctors, correct? The black box warning information. Only if they go online and look it up. So it's not, there would be no other reason that they would receive it. The doctors don't stack the drug. They don't get it. So they would have to look it up online. They're continuing education. We don't know. We don't know what. The question to Dr. Ross, were you aware of this 12-week limitation before you got sued in this case? No. You got sued in late 2014. So he was five years behind the times. And that's unfortunate, but it's not rare from my experience. There are thousands of drugs out there and doctors rely on pharmacists to keep them current on what the warnings are, what the contraindications are. Frankly, the heart of this case from a failure mode effects issue is us, this computer system, is terrible. It picked up the Vibrant contraindication, but it didn't pick up Revlin. It wasn't designed to do it and it should have been. And the computer guy says, yeah, we could have done that. But we rely on the pharmacist to know that information. It's no surprise the computer guy would throw the pharmacist under the bus. But if you're trying to prevent problems, wouldn't you want to program the computer to pick up this problem just like you did all the other drug interactions? Only if you have a duty to warn. And that's for this court. And I think it would do an awful lot for patient safety if this court found a duty. And Apple, there was no written warning, right? I mean, that's what it says in the decision. There were directions on the bottle that they received from the pharmacy, but there was no warning about contraindications. Heidi took the first dose and got sick. Right. The pharmacist, the pharmacy system in that case, the computer system, did pop up a contraindication. And the pharmacist in that case didn't see it, as I recall the record in that case. Just so we're clear, what's your position on the written warning that did exist in this case that was provided with the drug to the patient? What's your position on that? My position on that is it may be evidence of contributory fault, but it certainly does nothing to absolve OSCO from its duty to notify the physician verbally and to notify the patient verbally. Well, if there is a duty, is it your position that that warning is not sufficient? Correct. Or at least arguably is not sufficient? They negligently fulfilled their duty. Okay. What Dr. Pope testified to is that that language itself is confusing. It's difficult for a layperson to understand. The language in the paper. And, you know, it's eight-point type. It's the usual thing that you get when you go to the drugstore. Which very few people read anyway. That's also in the record in this case. Right. And if it's important, if it's a contraindication, call the doctor. That's what we're asking. So that's the only way to fulfill the duty is to call the doctor? That's the best way to fulfill the duty, Your Honor. This was insufficient in any event, is your position? They did none of the above. Okay. I think I should reserve the rest of my time. Thank you, counsel. Do you support? Good afternoon, Your Honors. The lower court, after undertaking a comprehensive review of the record and looking at illumination over the past 30 years, correctly held that, in this case, Illinois law is clear that no duty to warn is imposed on pharmacists except in very rare circumstances, such as contraindication. No court has extended a black box warning to equal contraindication. Apple created only a limited duty to warn a prescribing physician under the learned intermediary doctrine, as opposed to what may be equivalent to an excessive dosing case. In Eldridge, McCoy, and Hernandez, courts have not extended the exception to the learned intermediary doctrine to include the facts and circumstances present in this case. Therefore, OSCO did not fall within the exception of the learned intermediary doctrine and was under no duty to warn Dr. Rass about the recommended duration limits on taking a dosing. But really, how big a burden is it? I'm sorry. Yes, Your Honor. You can say it was. Your Honor, just the testimony in this case is that the pharmacists at OSCO fill 3,000 prescriptions a week, and they fill over 1,000 different types of medications during that week. Half of them contain black box warnings. So to think that this is a simple matter, this is well-established law in the state of Illinois that pharmacists, with that type of workload, with what they're doing to fill prescriptions, What plaintiffs asked this court to do is to adopt an expansive definition of contraindication that would abolish the learned intermediary doctrine in all the rule of law in 30 years of case law in Illinois. The Illinois Supreme Court in Happel stated at least twice in this opinion that a contraindication refers to a circumstance under which the drug must never be given. That's what the Illinois Supreme Court stated at least twice by my count. There was no dispute that... It must never be given to this patient. The warning in this case... No, I'm saying in Happel, that drug should never be given to that patient. Yes, in Happel, there was quite a few discerning elements of Happel. First, the pharmacist elicited from the customer, every time the customer came in, what your allergies were. And they entered that into their computer database. And then the court focused on that at length and said, when you're eliciting that type of information from a customer, you are holding yourself out to that customer that you will not give them a medication that is contraindicated for aspirin, which is what the patient told them, that she was allergic to aspirin. And Puerto Rico has a warning that it should not be given to patients who are allergic to aspirin. And there was no monitoring required. When the person came in with a prescription for Puerto Rico, and the DUR alert came up, in order to fill that prescription, the pharmacist actually should have called the doctor to override that alert, but did not call the doctor, and had to override the alert with that warning and to give the customer a drug that caused them a problem. So I think Happel is completely distinguishable with the type of medication that was filled and the type of warnings that accompanied that drug. So wouldn't the pharmacist warn if there were drug interactions? I'm sorry, what? Wouldn't the pharmacist warn if there was just simply going to be some sort of an interaction between two different drugs? Yes, and it's contraindicated. If Puerto Rico should never be given to somebody who doesn't understand aspirin, you cannot do it. There's no medical... Well, but sometimes it may not be that it never should be given, but that there could be an allergic reaction to two different types of drugs. They would warn. They would definitely warn the patient. Yes, there could be a contraindication that comes up because of the way the medications match up, and then the pharmacist needs to call because the alerts are not database. There's no monitoring required in that setting. Here, monitoring is required. There's no question. I think even counsel does not suggest... The monitoring was required. The prescriptions... That's the way the counsel wants to be. Yes, the monitoring would be required there. Here, you would have two drugs that are contraindicated from each other, and the alert pops up. And that's why further action has to be taken. And that's what happened with DG Ubaldi. In DG Ubaldi, there was an alert that came up between two drugs. The pharmacist called, and the doctor said, I will monitor the patient. The patient came back with a refill, and... Sorry. It just sounds a little bit troubling,  and that would be about 1,500 calls that they would need to make. That's what you're saying, correct? No, I think it goes deeper than that, Your Honor. I think it goes to the bedrock of what the learned intermediary doctor is about and who has the responsibility in these relationships. And what the law has said for well over 30 years, the Supreme Court has addressed it three times. The appellate courts have addressed it at least six or seven times, and they say the manufacturer has to tell the doctor about the drug. The doctor has to make him or herself aware of the propensities of that drug before they prescribe that drug. That's on the doctor. And then the doctor has to not know not only the propensities of the drug, the doctor has to know about the patient's condition. What the pharmacist needs to do is accurately fill that prescription. That's it. Nobody disputes it. You're saying that the only exception is where there's a contraindication. That's right. An absolute contraindication. That's right. That's what happens. And HAPA talks about not only should the drug not be given, but in essence, in HAPA, the pharmacist injected themselves into the patient-physician relationship by saying, are you allergic to anything? Now they are involved in that relationship. And when they cultivate that information and put it into their computer database and say this customer is allergic to aspirin, they are involved in it. And we haven't seen a case about what happens if a drug is contraindicated and the pharmacist has not stepped into that relationship. What we're dealing with are facts in HAPA, Kirk, Fry, the ice cream court cases that are considered to limit the mediary document and have cited it approvably. And just for sampling purposes, you said that they fill about 3,000 a week and you said that about 1,500 of those would involve this black box warning. So, yeah. Well, pharmacists testify to black box warnings, but my own expert testified that hundreds of drugs have black box warnings. But not black box warnings as to duration, just black box warnings of all kinds. Which means it's an important warning that you're on. I understand. It means it's a very important warning. But he's talking about black box warnings as to duration, and he says there's only three of those. Yes. He said there's three of those. Do you disagree with that? The records are filled out on that, so I will accept that for argument purposes here that there were three of what we're arguing about. But when you talk about thousands, those are not all as to duration. Those are as to a whole bunch of different things. Yes, that's right. So, duration. But Hernandez does touch upon this topic of duration. Because in Hernandez, it was a drug overdose. Some of these cases are drug overdose cases where people die. And in Hernandez, they said that not only did you fill in excessive quantities, but you filled them too quickly. It wasn't that you filled them for too long, you filled them too quickly. You should have known that you should have filled a prescription for that short a period of time. And that's why we have the room intermediary doctrine. Because particularly with Reglan, Reglan is the only drug to treat gastroparesis. The only drug. There is no other medication to treat gastroparesis, which is a serious complication to diabetes. It creates motility problems. It causes nausea, vomiting. Dr. Liu testified that 25 out of 30 of his patients who he was currently treating when he retook his deposition were on Reglan. All of them were taking it for more than a year. And some of them were taking it for over five years. And he said that with Mr. Albaniak's case, he thought he needed to take it indefinitely. But it would require monitoring. So, where do we draw this line on trying to shift the burden on the doctor to make the pharmacist become part of this relationship? Which in all these cases, every single case states that the pharmacist is not to interject itself into the physician-patient relationship. And by compelling the pharmacist to now start making decisions about... Nobody's suggesting the pharmacist should make decisions. That's something. They're saying the pharmacist should share the knowledge the pharmacist has, even if it's knowledge the doctor should also have. That's all. Whatever he's saying, the pharmacist should say, I'm not feeling that, that that's not the argument that's being made. And that's because of the state of the place. But, you know, if Mr. Albaniak came in shaking one day, is the pharmacist supposed to say, is this a symptom of target dystonia? I mean, where does this end? Once you start holding a pharmacist responsible... The pharmacist knows in the tent, eh? Once you start holding a pharmacist responsible, you are going to continue to have the same lives. I can take your sentence for it. I think what was already quite a bit here was the ignorance of the doctor. You didn't complete your sentence. I'm sorry. You started once you started holding the pharmacist liable. Then I completed your sentence. Once you start to hold the pharmacist responsible like a doctor, now you've got to... you've done away with the intermediary rule, and you're now making the pharmacist... Well, this would be... I think counsel's looking for a limited exception to the black box warning with duration, which there's only three medicines that are known that that would apply to. So it wouldn't be 1,500 phone calls. It would probably be 10 phone calls a week. So what we're actually requiring, Your Honor, is monitoring of the patient's prescription history. I just thought they did that anyway. So I guess that's going to be more than one prescription. There's no way you can do that, Your Honor. And that's what Hackel says. In fact, Hackel says one of the reasons we're going to not apply the limited intermediary doctrine here is because it does not require monitoring with this drug. And Hernandez says the same thing. And, in fact, Hernandez is interested because it dealt with the Illinois Controlled Substances Act, which requires a very sophisticated database compiling patient history. And the plaintiff's attorney in Hernandez argued that, with the click of a mouse, they could have accessed the patient's history for taking narcotics, and they didn't do it. And with the Illinois Controlled Substances Act, it imposes that duty to monitor. And the court said, no, there is no duty to monitor. Every single case that's considered this issue has said it. But wouldn't that already be in the system that any time that the regulant is given that... I would have hoped that it may be in the system. But what the court said is there's no duty to monitor that. The fact that it's in your system does not require you, because it interjects you into the relationship of the physician and the... So your position would be that even if those three pharmacists who claim to have been ignorant of the warning, even if they had the information, there would be no duty based upon the current state of the law, correct? That's right, Your Honor. That's right. There would be no duty. Now, Your Honor, that's wrong. What we should do is we're thinking what duty to change the relationship of what the doctor is supposed to do. When the doctor... The warning says that you have to weigh the therapeutic benefits against the risk of the drug. And that's not what the pharmacist is required to do. The pharmacist is allowed to operate with the understanding that the doctor knows the drug. Ignorance by the doctor does not impose a duty on the pharmacist. Dr. Ross is held to know what the duration is for the drug. He's held to know... He wasn't the first to prescribe the drug. I'm sorry? Dr. Ross wasn't the first to prescribe it. No, but he received a letter from the prior doctor, Will, saying this patient should be on it indefinitely. And interestingly, Dr. Ross testified. He was worried that they'd get this information to the doctor, the manufacturers, and Dr. Ross testified that if he's unfamiliar with the drug's propensities, he will look at a software database called Epocrates that contains the known side effects for the drug. He will also look at the PDRs. He will look at the product information lists. He has databases that he can search, and he says he does search them. So that issue in this case, Dr. Ross was clearly negligent because he simply relied upon information from another doctor where he probably just assumed this doctor must know what he's talking about. He said he's to be on this indefinitely and went along with that. Whereas had he been the initial doctor prescribing the prescription, he would have probably did some research. I would have known about the black box warning of duration. Yeah, I think if he was dispensing a medication he wasn't familiar with... For the first time. He should have been familiar with it. And that's what the law requires of him. And I think that's what any patient would expect of their doctor. Are you relying on the written warnings at all? I'm not addressing the written warnings, but I think Frey addresses that. We gave him warnings, and if he chose to read them or not read them, that's a mistake.  There's no duty on him because of his learned intermediary doctrine and how the relationships are supposed to be satisfied under Illinois law. There should never be a duty unless there's contraindication. Correct. Maybe not even then. How does the one case in Illinois that does not apply the learned intermediary doctrine, in the cell of a pharmacist filling a script that was accurately filled, and in that case it said, look, this set of circumstances in this case are so unique that we're going to impose a duty there under the analysis of the first step duty analysis of what was the magnitude of the day, was it reasonably foreseeable, and took that analysis forward and said, under that setting, we think there's enough to go forward. And that's what counsel's not getting here. Well, counsel's trying to give a definition of contraindication, but the learned intermediary doctrine would no longer apply, in my opinion, with all due respect. I just don't think that you can. Unless it was narrowly tailored. Unless it was what? Narrowly tailored. I'm so sorry to interrupt. Unless the rule was narrowly tailored. Yes, but so, and that's the question I think, and I think your Honor's questions were going to, what do you want this rule to be? And that's the part that shifts around in this entire argument and analysis is where do we go with this? Because when we look at Kirk v. Michael Reese Hospital, when we look at Fry, when we look at the Supreme Court opinions that happened, when we look at all the appellate court decisions, decisions under this court, it seems that it applies. And I just don't see where there's a narrow enough interpretation under these circumstances where the learned intermediary doctrine should not apply. Because it requires monitoring. It requires an assessment. It requires saying, oh, well, we warned the plaintiff already, but we better call his doctor because let's assume the doctor's ignorant. Let's assume the doctor doesn't know about the medication he's prescribing. And I just think that once you say that the pharmacist has to assume that the doctor doesn't know he's prescribing, there's no learned intermediary doctrine anymore. You shouldn't have it. You should do away with it, I think. So I think I've covered most of my points, Your Honor. Is there any further questions? Any further questions? No. Thank you, counsel. Thank you, Your Honor. Your Honor, as counsel wants to talk about the doctor-patient relationship and how the pharmacist shouldn't get involved, but Oscar's manual directly contradicts him. We've cited it in our brief. It talks about their computer system, their drug utilization DUR system. It's not a substitute for the pharmacist's, quote, personal review of every DUR issue to preserve the patient-slash-pharmacist-slash-physician relationship. This policy is intended to ensure that pharmacists review the DUR issues and make appropriate assessments prior to dispensing every prescription. And I don't care if it's a high-buying pharmacy or not. I can tell the court that the one witness who said maybe 50 percent of the drugs had black-box warnings, that was one of the staff pharmacists, and I would submit that that was speculation. I don't think that there's any question. Could you tell us, you know, Russ, about what is a black-box? What does that even mean? Just an important warning of some kind? Is that all it means? It is, Your Honor, and we set it forth in our brief, and it looks just like that. It does in this case, but there are black-box warnings for all sorts of things, right? For drowsiness or... I would say not for drowsiness. A black-box warning, it takes a special petition to the FDA. You have to show it can create an imminent danger of death or serious injury to require a black-box warning. Okay. So it's the strongest form of warning that the FDA requires. Clearly, it is. On the four-part DUR, Your Honor? Getting back to what you just said about the policy, can that policy create a duty? Yes, Your Honor, it clearly can. And they have, all through their manual, they discuss all these responsibilities that pharmacists have and that they have to make sure every prescription is safe when it goes out the door. And then when they get to court, it's just the opposite. And it shouldn't be that way, frankly, and doctors have to rely on pharmacists as a practical matter to notify them when the doctor's prescription violates a warning or creates a serious danger by interaction. And that's the limitation we have in this case, and that's what makes it special. It's not that there's just a black-box warning. There's a black-box warning that the prescription violates and continues to violate and creates a serious danger. So, you know, in the four-part duty test, the first two elements are satisfied by the FDA warning. The reasonable foreseeability and the likelihood of injury, they're all answered by the text of the warning. The magnitude of the burden, Happel said it, a phone call from the pharmacist is no burden at all. And we know this pharmacy made 12 calls to the doctor. The consequences of the burden? Well, Happel, in the middle of the opinion, says sometimes the status quo is unacceptable. And that's where we are here. It is unacceptable for a patient to get a drug for six years when there's a serious danger when you take it for more than 12. It took more than one person to make a mistake here. It took Dr. Ross. Thank you for a minute. You're on a great roll. But you have to not only satisfy the four-part test, you also have to get around the learned intermediary doctrine. Correct? I mean, because the learned intermediary doctrine is kind of an exception or a nuance to when we should find duty. I have a conceptual problem with that, Your Honor, and it's an important question. Okay. Happel went through the four-part duty test, and then he said the learned intermediary doctrine doesn't apply. But in the way I read Happel, that's two separate analyses. They did make two separate analyses. I didn't want to short-shrift the first one because I knew we talked about learned intermediary before. Right. We are just like Happel in getting around the learned intermediary doctrine. When counsel argued that the manufacturers notify the doctors of the risks and dangers of the drugs, they don't. As a practical matter, they publish information that's accessible online. Doctors don't get information from drug companies on a regular basis unless there's a sales rep coming in the door saying, use this drug. They don't get information about the drugs they prescribe. They have to seek it out. And doctors are busy, and they have to rely on pharmacists. So you're not asking us to dispense with the doctrine. Your point is that the doctrine doesn't apply. I think the doctrine does not apply, and I also think the doctrine is very limited. If you look at Happel, it says it exists only to the extent we're talking about dosage cases, which this is not a dosage case. This is a duration case with a black box warning. All those dosage cases are where there's a recommended dosage, and the doctor prescribed more, maybe twice as much because someone's heavier or someone has a different metabolism. I think those cases were rightly decided. Doctors need to make decisions on dosages. There were no warnings in those cases. None of the cases that we've discussed here today or in any of the briefs deal with black box warnings. None deal with drugs where there's a violation of a black box warning. Very clear, very important distinction. This is a very narrow fact issue. We're not here to try and change the law of pharmacy liability for every injured person in the world. We're here for the organics. And the duty to them, frankly, is very narrow that this pharmacy owes, which is to call the doctor. Tell the doctor what's needed because, you know, do you know that there is this black box warning and he's been taking it much longer than 12 weeks? And so if you were to narrow the tail of a holding, what would it be? I would say that as set forth in the record in this case, the summary judgment should be denied because on the facts here, there was a specific contraindication for this drug to be taken more than 12 weeks. The pharmacy should know of that. OSCO has a duty to know what the warnings are. They're in the business of prescribing drugs. They know from their own records how long the patient had been taking the drug. They know that's in violation of the black box warning. Pick up the phone, call the doctor. Directly tell the patient face-to-face this is an issue. The most reliable way to handle it, and I think the way most pharmacies do it, pick up the phone, call the doctor, and then they make a note. The pharmacy made a note. The doctor made a note. Both at the same time, we're discontinuing Vibrate. We got the call that there's an interaction. Pharmacy did the same thing. Doctor discontinued Vibrate. That's how these things work out most of the time. And because this call wasn't made, Stephan had to take this drug for a lot longer than he should have. The doctor would have stopped it if he'd gotten a phone call. So in terms of narrow duty issues, Halfel at the end of the opinion talks about the special circumstance, and that is that this pharmacy had actual knowledge that Heidi had an allergy to aspirin and therefore Toradol would be contraindicated. This pharmacy, OSCO, had actual knowledge that Stephan had been taking this more than 12 weeks and should have known that there was this contraindication based on the warnings they'd gotten from the FDA. They can't get away with being ignorant of the black box warning. They are pharmacy professionals. So we are right on with what Halfel is when it came to the end of the case to say why the limited intermediary doctrine does not apply. I hope I haven't gone on too long. Thank you, counsel. Thank you, everybody. Very broad and brief on both sides. Thank you. You will hear from us. I will take this under advisement and I believe the court is now adjourned.